IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CRAIG CUNNINGHAM, on behalf of )
himself and others similarly situated, )
)
)  Civil No. 1:16-cv-00545
Plaintiff, )
)  Hon. Liam O'Grady
v. )
)
GENERAL DYNAMICS INFORMATION )
TECHNOLOGY, INC., )
)
Defendant. )

## MEMORANDUM OPINION

This matter comes before the Court again on Defendant General Dynamics Information Technology, Inc.'s ("GDIT") motion to dismiss for lack of subject matter jurisdiction. On September 9, 2016, the Court heard oral argument on the Motion. This hearing came after an initial round of briefing. Upon consideration of the briefs and arguments at that time, the Court deferred ruling on Defendant's motion, but instead allowed Plaintiff Craig Cunningham to seek discovery on the issue of *Yearsley* immunity. That discovery period is now complete, and the parties have fully briefed the motion for a second time. (Dkt. No. 66). The Court dispensed with a second oral argument, and the motion is now ripe for resolution. For the reasons that follow, the Court hereby **GRANTS** GDIT's motion to dismiss.

### I. BACKGROUND

The factual details of this case were set forth in this Court's October 18, 2016 Order (Dkt. No. 47) (hereinafter "October Order") and will not be repeated unnecessarily here. Nonetheless,

1

Plaintiff has highlighted a few additional facts that he believes are relevant to this motion. These additional facts are included below, along with an overview of Plaintiff's claim.

In 2011, the Centers for Medicare and Medicaid Services (CMS) entered into a contract with Vangent, Inc. pursuant to authority that was granted to CMS under the Affordable Care Act (ACA). Under this contract, Vangent was tasked with handling communications regarding 1-800-MEDICARE communications, the healthcare.gov website, and the "Healthcare Marketplace Call Center." In April of 2013, GDIT assumed Vangent's position under the contract. *See* CMS-GDIT Contract, Mod. 30 at 69–70 (Dkt. No. 71-2) (hereinafter "the Contract" or "Modification 30").

In the October Order, the Court noted that the "statement of works" that GDIT submitted as evidence of the Contract was in a "track changes" or redline format. October Order at 9. The Court therefore determined that it could not accept the validity of the Contract on its face. Discovery has since confirmed that the contract is indeed valid and authentic. *See* Lester Dep. I at 11:4-12, 12:2-19, 13:20–14:14-16, 15:11-12 (Dkt. No. 71-5) (explaining the nature of Deborah Lester's authority as a contracting officer for CMS); Lester Dep. II at 11:7-18 (Dkt. No. 71-3) (explaining that Modification 30 was authorized in Ms. Lester's capacity as contracting officer for CMS). Plaintiff does not dispute the legal effect of the Contract or its Modifications.

Among other things, the Contract required that GDIT make calls from January 1, 2015 through May 16, 2016 to inform individuals about their ability to buy health insurance through the health insurance exchanges created by the ACA. In accordance with this instruction, CMS (1) authorized GDIT to use an autodialer to make calls; (2) provided a script for the calls; and (3) provided a list of phone numbers for GDIT to call.

2

Pursuant to this direction, on December 2, 2016, GDIT used an automatic telephone dialing system to call Plaintiff's cell phone. When Plaintiff did not pick up, a pre-recorded or artificial voice left the following message:

> Hello, this is an important message from healthcare.gov. The deadline to enroll in a 2016 health insurance plan is coming soon. You may be able to qualify for financial help to make health insurance more affordable. With financial help, most people can find plans for $75 or less per month. Visit healthcare.gov today to see how much you can save. If you have questions, you can call the health insurance marketplace to talk to a trained enrollment specialist at 1-800-318-2596. That's 1-800-318-2596. We are available 24 hours a day and the call is free. Don't forget, the deadline to enroll is Tuesday, December 15. If you've already taken action, and have 2016 health coverage, please ignore. Thank you. Goodbye.

Within minutes of receiving this call, Plaintiff called the number provided and learned that GDIT was responsible for making the call.

Plaintiff alleges that he did not consent to this call. He further alleges that this call was made using an automatic telephone dialing system within the meaning of the Telephone Consumer Protection Act (TCPA) and that "thousands [of] persons throughout the United States" received these messages. He asserts that this is a violation of the TCPA, because it constitutes a telemarketing or advertising call without prior express consent, as those terms are defined in the TCPA. Plaintiff therefore brings this claim on behalf of himself and two separate classes of individuals who received these or similar calls.

In support of his position, Plaintiff now highlights a few key terms in the Contract that he believes are relevant for the purposes of *Yearsely* immunity. First, he notes that Section 17 of the Contract required GDIT to maintain a corporate compliance program that required internal monitoring and auditing to "help ensure compliance with statutes, regulations, and the company's code of business ethics and conduct . . ." Modification 30 at 69–70. Second, he stresses that the Contract does not explicitly direct GDIT to make telephone calls without

3

obtaining prior express consent. *See* Opp'n at 5–6 (citing deposition testimony from Naomi Johnson and Deborah Lester).

Third, Plaintiff spends a significant amount of time discussing Section 4.1.1 of the Contract, which instructs:

> The contractor shall answer inbound calls and provide complete responses to all telephone and TDD/TTY inquiries. If required, the contractor shall make outbound calls to support customer service needs. Outbound calls may include both live CSR outbound calls as well as auto-dial message campaigns **(subject to state law)** utilizing system generated call technology.

Modification 30 at 6 (red-line format removed and emphasis added). The deposition testimony in this case has clarified that the "subject to state law" insertion into Modification 30 was provided in response to GDIT's concerns about making calls in Alaska and Arizona. *See* Lester Dep. II at 8:11–9:17; Bartenhagen Dep. at 79:12–80:1 (Dkt. No. 71-6) (explaining that Alaska and Arizona were excluded from some of GDIT's calling campaigns).

Furthermore, Plaintiff has uncovered emails which show that GDIT was aware of the Telephone Consumer Protection Act (TCPA) and its requirements. Initially, he points out that GDIT confirmed (via email) that it may only call individuals during certain times in order to comply with the TCPA. *See* Davis Dep. at 38:3–42:18 (Dkt. No. 73-5). Next, he highlights that GDIT sent an email to CMS on March 12, 2015 that announces the consent requirements of the TCPA. Johnson Dep. II, Cunningham Ex. 14 at 88 (Dkt. No. 73-4). It reads:

> The Telephone Consumer Protection Act of 1991 (TCPA) was passed by the United States Congress in 1991 and signed into law by President George H. W. Bush as Public Law 102-243. It amended the Communications Act of 1934. The TCPA is codified as 47 U.S.C. 227.
>
> The TCPA restricts telephone solicitations (i,e., telemarketing) and the use of automated telephone equipment. The TCPA limits the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages, and fax machines. It also specifies several technical requirements for facsimile machines, auto dialers, and voice messaging systems.

4

> The Telephone Consumer Protection Act (TCPA) (47 U.S.C. 227 ,47 CFR 54.1200) prohibits the use of an 'automatic telephone dialing system' to contact "any telephone number assigned to a ...cellular telephone service" without "express prior consent" from the party being called.

*Id.* This email also highlights the legal requirements that apply in Alaska and Arizona law. *Id.*

## II. STANDARD OF REVIEW

In this case, GDIT challenged the factual bases for jurisdiction in a 12(b)(1) motion. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When this happens, courts may consider evidence outside of the pleadings to resolve the disputed jurisdictional facts. *Id.* When the jurisdictional facts are "inextricably intertwined with those central to the merits, the district court should resolve the relevant factual disputes only after appropriate discovery." *In re KBR, Inc. Burn Pit Litigation*, 744 F.3d 326, 334 (4th Cir. 2014). Where the court is satisfied that it has a full record before it, it may grant a motion to dismiss based on the parties' submissions, including affidavits and testimony. After 75 days of jurisdiction-related discovery, the issue is now ripe for review.

## III. DISCUSSION

The legal conclusions made in the Court's October Order have not been disturbed in any way by discovery. *See* October Order at 5–8; *see also United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (explaining the Fourth Circuit's law-of-the-case principles). Accordingly, GDIT "is not subject to suit if (1) the government authorized [GDIT's] actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 342 (4th Cir. 2014) (citing *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21–22 (1940)).

Plaintiff's factual discovery has firmly established that both of these elements have been satisfied. As the October Order noted, the Contract directed GDIT to perform a series of duties, which included, among other things:

> (1) answering inquiries and making outbound calls regarding the ACA; (2) using autodialing technology to initiate outbound telephone calls to individuals who had begun the enrollment process for health coverage at Healthcare.gov; (3) providing the exact script that Mr. Cunningham received to remind applicants of their enrollment deadline; and (4) providing a list of applicants' phone numbers that included Mr. Cunningham's number.

October Order at 8. Therefore, although Plaintiff raises some additional legal arguments regarding the applicability of *Yearsley* immunity, he has done absolutely nothing to draw into question the fact that CMS "authorized and instructed GDIT to do *exactly* what it did (to the word) in delivering the message that it left on Plaintiff's message machine." *Id.* This conclusion bestows immunity on GDIT and requires the Court to dismiss the Complaint.

A. **Plaintiff's Arguments**

In light of the factual realities confronting him, Plaintiff's arguments are necessarily narrow, and it is useful to highlight the uncontested points in this motion. Plaintiff has not challenged the legitimacy of the authority granted by the ACA. Indeed, the Supreme Court has conclusively put that issue to bed. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2572 (2012); *King v. Burwell*, 135 S. Ct. 2480 (2015). Moreover, he has not challenged that Ms. Lester had the authority to contract with GDIT. In accordance with that concession, he does not dispute the validity of the CMS-GDIT Contract or Modification 30. Furthermore, Plaintiff admits that CMS directed GDIT to "download a list of telephone numbers—which included Plaintiff's cell phone number—and directed GDIT to make autodialed, prerecorded calls on December 2, 2016 to those telephone numbers using the script [provided]." Opp'n at 9.

These factual concessions leave Plaintiff with three creative legal arguments. First, he argues that *Yearsley* immunity only extends to violations of state law and is therefore unavailable for federal statutes such as the TCPA. Second, he asserts that federal agencies cannot "validly confer" authority to engage in conduct that violates a federal statute. Third, he posits that the TCPA and the Contract required GDIT to obtain express written consent and nothing in the Contract directed GDIT to make calls without separately obtaining that consent. These arguments are unconvincing.

Where it applies, the law is clear that *Yearsley* protects federal contractors from both state and federal causes of action. Indeed, *Yearsley* itself was a case that arose under the Takings Clause of the Fifth Amendment. *See W.A. Ross Const. Co. v. Yearsley*, 103 F.2d 589, 592 (8th Cir. 1939), *aff'd*, 309 U.S. 18, 60 (1940). More recently, the Supreme Court conducted a fulsome analysis of *Yearsley* immunity in the context of the TCPA—the same statute at issue here. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943) ("[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States.")). Moreover, the Fourth Circuit has not deviated from this rule. *See Tozer v. LTV Corp.*, 792 F.2d 403, 405 (4th Cir. 1986) (finding that *Yearsley* immunity shielded defendant from liability in a suit brought under the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.*).

Seeking to avoid this overwhelming caselaw, Plaintiff cites to *Boyle v. United Technologies Corp.* in support of the contention that *Yearsley* immunity is only applicable to state law claims. 487 U.S. 500 (1988). This citation is inapposite. First, *Boyle* does not in any way limit itself to state causes of action. It is true that *Boyle* dealt with state law, but that is only because the plaintiff's claims arose under state law in that case. Accordingly, the Supreme

Court's analysis in *Boyle* drew on principles of federal preemption and "uniquely federal interests" to reach its conclusion. The same principles of federalism were simply not present in *Yearsley*, and they are not present here.

Second, the *Boyle* doctrine is different in nature from *Yearsley* immunity; *Boyle* articulates a preemption *defense*, while *Yearsley* sets forth jurisdictional bar to suit. *See* October Order at 6–8 (explaining why *Yearsley* immunity is jurisdictional in nature); *see also In re KBR*, 744 F. 3d at 342 n.6 (distinguishing between the *Boyle* preemption analysis and the *Yearsley* immunity analysis). Thus, the two doctrines are fundamentally distinct. One possible explanation for this distinction is the fact that *Boyle* dealt with a procurement contract rather than a performance contract. *Boyle*, 487 U.S. at 506–07 (discussing the federal interest in protecting contracts for the procurement of equipment). In a procurement contract such as the one in *Boyle*, the government contractor is providing products to the government so that the government may perform its tasks. By contrast, in a performance contract like this one and the one at issue in *Yearsley*, the contractor stands in the shoes of the government and executes tasks that would otherwise be performed by a federal agency. Thus, the principle underlying *Yearsley* is not that "uniquely federal interests" preempt plaintiff's claims, but rather that contractors should not be punished for their "compliance with all federal directions" when they are performing governmental tasks. *Campbell-Ewald*, 136 S. Ct. at 673 n.7 As such, even if the applicability of *Boyle*'s preemption doctrine is restricted only to state claims, it does not follow that *Yearsley* immunity is similarly limited.

Plaintiff's second argument does not fare any better. He argues that "government agencies cannot 'validly confer' authority to engage in conduct that violates a federal statute." Opp'n at 14. This argument has rhetorical appeal at first blush, but its acceptance would

completely undermine the purpose of *Yearsley* immunity. The law makes clear that the "validly conferred" prong of *Yearsley* focuses on the constitutional power to delegate tasks to private contractors. *See* October Order at 5 (quoting *In re KBR*, 744 F.3d at 344 n.7). Looking beyond the validity of that grant of authority would require the Court to assess the merits of a claim before even making its jurisdictional determination. Thus, as Defendant frames it, Plaintiff's argument "puts the cart before the horse." Reply in Supp. at 10.

By way of illustration, it is useful to point out that CMS could not be sued under the TCPA because it enjoys sovereign immunity by virtue of its status as a federal agency. *See Radin v. United States*, 699 F.2d 681, 685 (4th Cir. 1983) ("[A]ny claim for monetary relief against [a federal agency] would have to be paid with public funds, thereby making the United States the real party in interest. The claim for damages against this federal agency is barred by sovereign immunity unless Congress has expressly or impliedly consented to suit . . ."). When dealing with sovereign immunity, whether derivative or otherwise, the key issue is waiver. *United States v. Sherwood*, 312 U.S. 584, 586 (1941) ("The United States . . . is immune from suit save as it consents to be sued."); *see also In re KBR*, 744 F.3d at 333 (discussing the waiver provisions of the FTCA). Unlike some other federal statutes, the TCPA contains no waiver provisions. *See United States v. Gaubert*, 499 U.S. 315, 319 n.4 (1991) ("The [Federal Tort Claims Act], subject to various exceptions, waives sovereign immunity from suits for negligent or wrongful acts of Government employees."). As such, because GDIT followed CMS's instructions to a "T", it does not matter whether the underlying call would have violated the TCPA. Because CMS cannot be sued under this statute, neither can GDIT, so long as it followed CMS's precise directions.

Having established these principles, Plaintiff's third argument also fails. Plaintiff alleges that, under the Contract, Defendant had an obligation to seek express written consent before calling Mr. Cunningham.[1] The evidence in this case conclusively establishes that no such requirement existed. This is most apparent in the deposition testimony of Naomi Johnson:

> Q. Did CMS ever direct GDIT to make [auto-dial] calls and to get prior informed consent? A. No." *Id.* at 52:14-16
>
> Q. Is it also fair to say that CMS didn't direct GDIT to investigate those numbers or who provided those numbers? A. Yes. That's correct." *Id.* at 53:14-17.
>
> Q. And, is it fair to say also, that CMS didn't expect GDIT to get consent before auto-dialing? A. Correct." *Id.* at 54:3-5

Thus, nothing in CMS's instructions required GDIT to obtain express consent. Moreover, stepping back for a moment, it would have been an onerous task indeed for GDIT to separately obtain the written consent of every one of thousands of individuals whose numbers were on the list that GDIT downloaded on December 2, 2016. If obtaining consent were truly a contractual term, one would expect the statement of works to address procedures for recording these expressions of consent. In this case, without specific instructions in the Contract or any evidence to the contrary, the Court will not impose such a term on GDIT.

## B. Procedural Questions

The final question to address is whether the Court has the authority to dismiss the case with prejudice notwithstanding the fact that *Yearsley* immunity acts as a jurisdictional bar in the Fourth Circuit. *See* October Order at 6–7 (discussing the circuit split on whether *Yearsley* immunity is jurisdictional or not)

---

[1] Given the nature of the Court's decision, it need not assess whether GDIT actually complied with state and federal law in this case by failing to obtain consent. Nonetheless, it is worth noting that GDIT made a concerted effort to comply with all rules and regulations, and even insisted that it not be required to call individuals in Alaska and Arizona for fear of violating their laws. *See* Johnson Dep. II, Cunningham Ex. 14 at 88 (Dkt. No. 73-4) (explaining in an email the federal and state legal requirements for calls of this nature); Bartenhagen Dep. at 79:12–80:1 (Dkt. No. 71-6) (explaining that Alaska and Arizona were excluded from some of GDIT's calling campaigns).

Initially, it is worth noting that the circuit split discussed in the October Order has very little practical meaning where, as here, the parties engaged in a fulsome discovery process to ensure that immunity is appropriate. In disagreeing with the Fourth Circuit's determination that *Yearsely* immunity is jurisdictional, the Sixth Circuit stated that "*Yearsley* immunity is, in our opinion, closer in nature to qualified immunity for private individuals under government contract, which is an issue to be reviewed on the merits rather than for jurisdiction." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 980 (2016). But this statement ignores the fact that, "[w]here additional fact development is necessary on the issue of subject matter jurisdiction, courts have the power to order discovery on that question." October Order at 8 (quoting *Rich v. United States*, 811 F.3d 140, 145 (4th Cir. 2015)). Thus, in ordering the parties to engage in 75 days of discovery, the Court can now conclusively establish the *merits* of the subject matter jurisdiction inquiry. Whether this is done through summary judgment or through a 12(b)(1) inquiry is of no practical import.

Having decided the merits of the jurisdictional inquiry in GDIT's favor, the issue of whether Plaintiff's complaint should be dismissed with or without prejudice is squarely before the Court. Typically, a "dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice." *In re Camp Lejeune N. Carolina Water Contamination Litig.*, No. 1:11-MD-2218-TWT, 2016 WL 7049038, at *34 (N.D. Ga. Dec. 5, 2016) (quoting *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229 (11th Cir. 2008) and collecting cases). On the other hand, "the bar of sovereign immunity is absolute: no other court has the power to hear the case, nor can the [Plaintiffs] redraft their claims to avoid the exceptions to the FTCA." *Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988); *see also id.* at 35 ("[F]or all practical purposes, there is no other forum where the Plaintiffs could bring

11

these claims without meeting the same sovereign immunity obstacle . . ."). Thus, when courts dismiss claims on sovereign immunity grounds, they frequently do so with prejudice. *See, e.g., Int'l Fed'n of Prof'l & Tech. Engineers v. United States*, 934 F. Supp. 2d 816, 820 (D. Md. 2013), *aff'd sub nom. Int'l Fed'n of Prof'l & Tech. Engineers v. Haas*, 599 F. App'x 477 (4th Cir. 2014) ("[T]he United States is dismissed from this action, and the claims against it are dismissed with prejudice."); *Best Med. Belgium, Inc. v. Kingdom of Belgium*, 913 F. Supp. 2d 230, 233 (E.D. Va. 2012) ("The Court GRANTS Defendant's Motion, finding subject matter jurisdiction lacking as to all Defendants, and thus DISMISSES Plaintiffs' claims with prejudice.").

The Court finds that a dismissal with prejudice is appropriate here. Without jurisdiction, the Court is not empowered to consider the merits of Plaintiff's substantive TCPA claim. However, that does not take away from the fact that the Court has fully considered and analyzed the factual merits of the jurisdictional inquiry. In doing so, it has established that GDIT is entitled to derivative sovereign immunity under *Yearsley*. *See United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am.*, 330 U.S. 258, 291 (1947) ("[A] federal court always has jurisdiction to determine its own jurisdiction.")). Thus, any additional litigation of this issue in a different court would amount to an unnecessary drain on judicial resources.

Put differently, the Court's decision undoubtedly has preclusive effect as to the issue of *Yearsley* immunity. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("Issue preclusion . . . bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.") (internal quotation marks omitted). Therefore, because the resolution of the *Yearsley*

issue acts as a complete bar to any future suit against GDIT on this TCPA claim, the case may not be re-litigated in any other forum, and dismissal with prejudice is appropriate.

## IV. CONCLUSION

For these reasons, the Court finds that GDIT is entitled to derivative sovereign immunity under *Yearsley* and its progeny. 309 U.S. 18 (1940). As such, Mr. Cunningham's claims are hereby **DISMISSED** with prejudice. An appropriate Order shall issue.

Liam O'Grady
United States District Judge

May 1, 2017
Alexandria, Virginia